IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CODY L. CARNEY                                                          PLAINTIFF

     v.                              Civil No.  16-5214

DR. KARAS; NURSE KELLEY OLIVER;
and NURSE LANDON HARRIS                                      DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

The Plaintiff is currently incarcerated in the Grimes Unit of the Arkansas Department of

Correction (ADC).  The events that are the subject of this lawsuit occurred while the Plaintiff

was incarcerated in the Washington County Detention Center (WCDC).

The case is currently before the Court on the Motion for Summary Judgment (ECF No.

34) filed by the Defendants.  A hearing was held on May 19, 2017, to allow the Plaintiff to testify

in response to the Motion.  Plaintiff appeared via video conference.

At the hearing, Plaintiff moved to dismiss his claims against Nurse Andrew Piazza and

Nurse Phebe Grothaus.  They were terminated as Defendants (ECF No. 40).  Plaintiff has sued

the remaining Defendants in both their individual and official capacities.

## I. BACKGROUND

Plaintiff was booked into the WCDC on May 10, 2016.  (ECF No. 36-2 at 1).  On May

12, 2016, Plaintiff admitted to violations of his parole.  *Id.* at 3.  He remained incarcerated at the

WCDC until the Fall of 2016, when he was transferred to the ADC.

-1-

AO72A
(Rev. 8/82)

According to Captain Mulvaney, emergency medical services are available twenty four hours a day for WCDC detainees. (ECF No. 36-1 at 2). However, the primary medical care provider is the facility medical provider or his personnel. *Id.* Detainees may make medical requests daily for review by qualified medical personnel. *Id.*

Nursing staff is responsible for following all physician's orders that have been placed in the files of detainees. (ECF No. 36-1 at 2). If directed to do so by the physician, nursing staff make any outside medical appointments for detainees. *Id.*

Since January 1, 2016, Dr. Karas has been the jail medical doctor and Karas Correctional Health has provided all medical care in the WCDC pursuant to a contract with Washington County. (ECF No. 36-1 at 3). According to Corporal Mulvaney, all decisions regarding medications, medical testing, or medical treatment are left to the professional medical judgment of the jail physician. *Id.*

Plaintiff testified that he had problems with his back his whole life. *See also* (ECF No. 36-7 at 8). Plaintiff indicated that he would get a sharp pain and fall to his knees if he tried to lift too much. (ECF No. 36-7 at 10). He never sought medical care for his back problems and just "toughed it out." *Id.* This is a separate issue from the problem he had at the WCDC. *Id.* at 9.

Plaintiff indicated that on New Year's Day 2014, he fell down some stairs injuring his back. (ECF No. 36-7 at 14). A "bubble" developed at the base of his spine and it popped. *Id.* at 15. He testified he went to the hospital and they cleaned it and prescribed antibiotics and painkillers. *Id.*

AO72A
(Rev. 8/82)

About thirty days before Plaintiff was arrested, the area at the base of his spine started bothering him again. (ECF No. 36-7 at 15). His mother talked to a doctor and had it set up for Plaintiff to go and see what they could do for him, but he was arrested before he could go. *Id.* at 15 & 52. He kept it clean with antibacterial soap, triple antibiotic lotion, and Band-aids. *Id.* at 16. He took Aleve or Ibuprofen "every now and then" for the pain. *Id.*

Prior to his incarceration, when he had been prescribed antibiotics, they were not very effective. Plaintiff testified he told jail medical staff this.

Plaintiff testified that when he was booked into the WCDC, he explained that he had an open wound on his lower back, just at the end of his spine. It did not bother him too much until he had a physical altercation with two other inmates not long after he was booked in. (ECF No. 36-7 at 17). After that, both his back and the wound started bothering him. *Id.* at 18.

He stated he was in a constant state of pain, which was exacerbated if he stood up too long, sat wrong, or slept wrong. He described the wound size as being a little smaller than a silver dollar.

On May 28, 2016, Plaintiff submitted his first medical request for a twenty-four hour mat because of his back injury. (ECF No. 36-3 at 1). He noted he had a back injury "and still ha[d] a hole in my back." *Id.* He stated he was the fourth man in a three man cell and was sleeping on the concrete floor which was causing him great discomfort. *Id.*

In response, Plaintiff was told there would be a form for him to fill out on the evening med cart. (ECF No. 36-3 at 2). On June 6, 2016, Christy Hill responded: "Your request has been denied stating that bed rest all the time is not healthy." *Id.* Plaintiff testified he was not asking to be put on bed rest, he just did not want to have his mat taken away during the day.

-3-

According to Plaintiff, when inmates are on lock down, the mats are taken away approximately 4:30 a.m. until between 6:30 p.m. and 9:00 or 10:00 p.m. Plaintiff acknowledged that he had a sheet and towel he could prop behind his back. Plaintiff testified that during this period of time, he had to have a cell-mate help him out of bed. Plaintiff indicated he was in so much pain that when he would try to get up he would fall to his knees. The open wound had developed into an abscess on his tail bone.

On June 6, 2016, Nurse Harris approved Plaintiff for a second mat. (ECF No. 36-5 at 7). Plaintiff testified he had a double mat the entire time he was at the WCDC.

On June 9, 2016, Plaintiff was put on the twenty-four hour mat list and the double mat list. (ECF No. 36-5 at 5-7). Plaintiff testified he remained on both lists until June 16, 2016. Plaintiff testified that after June 16th, he was never allowed to have his mat twenty-four hours a day. When he had mats during the day, Plaintiff would walk around until it started hurting and then would lay down in an attempt to ease the pain. Plaintiff testified the mat gave him some amount of comfort. Plaintiff testified that after he was taken off the twenty-four hour mat list, the wound got irritated and became swollen.

On June 13, 2016, Nurse Grothaus ordered wound care for the next seven days. (ECF No. 36-5 at 4). She noted Plaintiff reported not getting his second mat. *Id.* Plaintiff testified, however, that he did not receive the wound care for the full seven days. He indicated he would have to ask for triple antibiotic ointment.

Plaintiff was seen by Dr. Karas on June 17, 2016. (ECF No. 36-5 at 3). Dr. Karas cleaned the abscess and surrounding area and then made an incision to drain the abscess. *Id.*

-4-

Dr. Karas diagnosed it as a pilonidal cyst.[1]  *Id.*  He prescribed Bactrim for a week and warm compresses.  *Id.*  Dr. Karas gave Plaintiff Naprosyn[2] for pain, twice a day, until June 20, 2016. *Id.* at 4.   Dr. Karas also put Plaintiff on the twenty-four bed rest on a mattress.  *Id.*

There were times when Plaintiff just popped the abscess himself.  (ECF No. 36-7 at 28). Plaintiff also testified that on some unspecified date, he had an inmate pop the abscess with a pencil.

On June 20, 2016, Nurse Grothaus gave the Plaintiff Band-aids and neosporin for the wound.  (ECF No. 36-5 at 4).  On July 1, 2016, Plaintiff asked why he had been taken off the twenty-four hour mat list.  (ECF No. 36-3 at 3).   Plaintiff noted the doctor had "cut his back about a week and a half ago."  *Id.*  Plaintiff stated he was in excruciating pain from having to sleep on a metal bed frame all day.  *Id.*  On July 2, 2016, Plaintiff complained that it "kill[ed]" him to be on his feet all day or to sit on the hard metal bed.  *Id.*  On July 3, 2016, Plaintiff again asked why he had been taken off the twenty-four hour mat list.  *Id.* at 4.  Nurse Harris closed the request without commenting.

On July 3, 2016, Plaintiff submitted a request stating he had been told by Sergeant Ake that he had to make a request every fourteen days to remain on the twenty-four hour mat list. (ECF No. 36-3 at 4).  Plaintiff asked to be put on the twenty-four hour mat list.  *Id.*  Nurse Regina Walker responded that there was no stop date on the second mat order.  *Id.*  She did not address the issue of whether Plaintiff could keep his mat twenty-four hours a day.  *Id.*

---

[1]"A pilonidal (pie-low-NIE-dul) cyst is an abnormal pocket in the skin that usually contains hair and skin debris. A pilonidal cyst is almost always located near the tailbone at the top of the cleft of the buttocks." http://www.mayoclinic.org/diseases-conditions/pilonidal-cyst/basics/definition/con-20025007 (accessed October 6, 2017).

[2]"Naprosyn (naproxen) is a nonsteroidal anti-inflammatory drug (NSAID). ... Naprosyn is used to treat pain or inflammation." https://www.drugs.com/naprosyn.html (accessed October 6, 2017).

AO72A
(Rev. 8/82)

On July 4, 2016, Plaintiff again asked for an explanation of why he had been taken off the twenty-four hour mat list. (ECF No. 36-3 at 4). On July 5, 2016, Nurse Harris responded: "A 24 hour mat encourages a sedentary lifestyle that is unhealthy. 24 hour mats will only be issued in extreme circumstances and only for short periods of time in cases of acute injuries." *Id.*

Plaintiff testified both mats were being taken away from him during the day and he was still on twenty-three hour a day lock down. Plaintiff testified he would get up and walk around but that after about thirty minutes, his back pain would worsen. Plaintiff testified it was hard for him to stand for any length of time. According to Plaintiff, Nurse Harris acted like he did not care that Plaintiff was on twenty-three hour a day lock down.

On July 7, 2016, Plaintiff submitted another request asking about the mats. (ECF No. 36-3 at 5). He stated that he was on the double mat list and that was a blessing. *Id.* However, he said the issue he was having was that they took the mats early in the morning and that he could only stand and move around for ten minutes or so before he had to sit. *Id.* He said sitting on the metal racks was "starting to be extremely painful, almost unbearable at times." *Id.* Nurse Harris responded that his mats were taken during the day because of a rule that applied to inmates in segregation. *Id.* Nurse Harris indicated that the medical personnel did not control the segregation rules. *Id.* Further, Nurse Harris stated that Plaintiff had no need for twenty-four hour a day bed rest. *Id.*

Plaintiff testified he was being housed in segregation because detention center personnel believed he was too violent to be housed in general population. Plaintiff remained in segregation the entire time he was at the WCDC.

-6-

Plaintiff testified that on July 10, 2016, and July 11, 2016, he refused his morning acetaminophen. Plaintiff stated he tried to explain that it did not help. Plaintiff testified he thought it was an antibiotic and since they did not work, he refused it.

On July 17, 2016, Plaintiff asked for a twenty-four hour mat because his wound was not getting better. (ECF No. 36-3 at 5). He was told he would have to ask for a mat request, fill it out, and go from there. *Id.*

On July 21, 2016, Plaintiff submitted a request stating that the spot on his back was hurting again and starting to send sharp pains up his spine. (ECF No. 36-3 at 6). He asked for help in getting on the twenty-four hour mat list. *Id.* In response, Plaintiff was placed on the sick call list. *Id.* On July 22, 2016, Plaintiff was told that the nurse had reviewed his medical request and there would be a form on the evening med cart for him to complete and return to medical. *Id.*

On July 29, 2016, Bactrim was prescribed to start that day and continue until August 5, 2016. (ECF No. 36-5 at 1). On July 30th, July 31st, August 2nd, August 3d, and August 5th, 2016, Plaintiff refused doses of the antibiotic Bactrim. (ECF No. 36-4 at 5).

On August 6, 2016, Plaintiff submitted a request stating the spot on his tail bone was starting to become an open sore again. He asked for a twenty-four hour mat and some type of medication other than Bactrim.

On August 8, 2016, Nurse Oliver cleaned, drained, and cultured the wound. (ECF No. 36-5 at 1). The culture came back as having no infection. (ECF No. 36-3 at 7); (ECF No. 36-4 at 3-4). Plaintiff was instructed on how to clean the wound.

-7-

By affidavit, Dr. Karas asserts that "[t]he decision not to place Mr. Carney on 24 hour bedrest was medically appropriate as it is important for him to remain physically active and encourage circulation. A second mat would not be beneficial for wound healing and could become detrimental in the long run." (ECF No. 36-8 at 3).

Plaintiff maintains the Defendants denied him adequate medical care. Plaintiff alleges Dr. Karas only provided the bare minimum of care in order to save himself, the county, and the jail money. Plaintiff testified the only treatment he received from Dr. Karas was that he lanced the abscess. Plaintiff indicated that he was then sent back to his cell to lay on a metal bed. Plaintiff believes that Dr. Karas could have ordered more effective antibiotics or should have at least authorized him to have a twenty-four hour mat. Plaintiff also believes he should have been seen at the hospital to be "cut open or "sew[n] up or something." (ECF No. 36-7 at 51). He believes he should have seen someone outside the jail. *Id.*

Plaintiff testified that Nurse Oliver cleaned the wound and said she would put him on the second blanket list. Plaintiff testified, however, that the second blanket was taken away and he was told he was not on the second blanket list.

Plaintiff felt like Nurse Oliver said she would put him on the second blanket list just to get him "out of her face." Plaintiff testified he complained a lot because he was in pain and he felt like Nurse Oliver was just putting him off. He believed she did the bare minimum for him.

Plaintiff testified that Nurse Harris was rude and acted like he did not want to help at all. Plaintiff states Nurse Harris would "blow [him] off" and basically say that he did not care what Plaintiff's medical needs were and that he was not going to get anything. (ECF No. 36-7 at 42).

-8-

Plaintiff also testified he was involved in a verbal altercation with Nurse Harris.  Plaintiff indicated he was just asking Nurse Harris why the medical staff did not do as much as they could for the inmates.  (ECF No. 36-7 at 43).  Plaintiff mentioned he had trained as a certified nurse assistant (CNA).  *Id.*  Plaintiff indicated Nurse Harris "just blew up at me, started cussing me up one side and down the other" and said "man, if you was out right now, I'd kick you[r] a–."  *Id.* (alteration added).

In general, Plaintiff felt the nurses treated inmates in general population better than inmates in segregation.  (ECF No. 36-7 at 44).  He believed the inmates in segregation were regarded as the "bad guys of the population" even though you could be in segregation for any number of reasons.  *Id.*

Plaintiff testified that as to his official capacity claim, jail policy provided that the only way an inmate could keep his mat all day was if the medical personnel put him on the twenty-four hour a day list.  Despite this, medical staff said they did not control the rule in segregation requiring mats to be taken away during the day.

When he was transferred to the ADC, Plaintiff testified the wound on his back was irritated and had a "big red spot around it."  (ECF No. 36-7 at 49).  Plaintiff indicated he was told while he was at Malvern Diagnostics that the hole was so big they were surprised it was not infected.  *Id.* at 50.  His mobility was also impaired.  *Id.*  Plaintiff testified he could not touch his toes without a sharp pain up his spine and could not squat without sharp pain.  *Id.* at 49.

Plaintiff testified that to the date of the hearing the spot was sore, draining, and bleeding. At the ADC, the wound was cleaned daily.  Plaintiff was given Naproxen that he could keep on his person and was also given triple antibiotic ointment.  Plaintiff testified that the ADC would

-9-

have taken him to a hospital to have his wound "cut open all the way to see what's really wrong and then have me sewed up so I ain't got it" but that the date that he was eligible for release was too close for that to be arranged. (ECF No. 36-7 at 51).

## II. APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

-10-

## III.  DISCUSSION

Defendants contend they are entitled to summary judgment on the following grounds: (1) Plaintiff was not denied adequate medical care; (2) they are entitled to qualified immunity; and (3) there is no basis for official capacity liability.

Defendants maintain that all Plaintiff's medical requests were responded to; his wound was examined and treatment ordered; the wound was cultured and showed no infection; and his requests for additional access to a mat were considered and granted when deemed medically necessary.  Defendants state the requests were denied when it was determined there was no medical need for him to be on 24 hour bed rest.

### (A).  Denial of Medical Care

The Eighth Amendment's prohibition against cruel and unusual punishment establishes the government's obligation to provide medical care for those whom it is punishing by incarceration.  An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (internal quotation marks and citation omitted).  "For this reason, the Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners."  *Robinson v. Hager*, 292 F.3d 560, 563 (8th Cir. 2002) (citing *Estelle*, 429 U.S. at 104).  The Eighth Amendment does not, however, mandate that the medical care provided to the prisoner "be perfect, the best obtainable, or even very good."  *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991).

In order to succeed on a denial of medical care claim, an inmate must show both that he had an objectively serious medical need and that the defendant was deliberately indifferent to that need.  *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (citations omitted).  "A medical

-11-

need is serious when it has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Phillips v. Jasper County Jail*, 437 F.3d 791, 795 (8th Cir. 2006) (citation omitted). "Deliberate indifference may be demonstrated . . . by prison doctors who fail to respond to prisoner's serious medical needs. Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citation omitted). A prison doctor's medical judgment on how to best diagnose or treat a prisoner, even if negligent or in error, does not constitute deliberate indifference. *Estelle*, 429 U.S. at 105-06.

Here, Plaintiff was provided with a second mat; Dr. Karas examined the wound and lanced it; the wound was cultured; the culture showed no evidence of infection; Plaintiff was given antibiotics; he was given medication for pain relief; for short periods of time, he was placed on the twenty-four hour mat list so that he could rest during the day; he was provided with triple antibiotic ointment and Band-Aids to cover the wound; and he indicated he had the knowledge to keep the wound clean and had been trained as a CNA.

While it is true Plaintiff felt he should have been allowed to keep his mat twenty-four hours a day for the length of the stay and felt he should have been sent to an outside doctor, this amounts to a mere disagreement with the treatment decisions made by Defendants. Dr. Karas did not think twenty-four hour bed rest was medically appropriate. Further, Plaintiff did have a sheet and towel he could prop behind his back to ease the pressure on the base of his spine. It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010). There is no genuine issue of material

-12-

as to whether Dr. Karas, Nurse Oliver, or Nurse Harris exhibited deliberate indifference to Plaintiff's serious medical needs. While Nurse Harris may have proved to be rude, unpleasant, and unprofessional to deal with, this does not equate to deliberate indifference to Plaintiff's serious medical needs.

### (B). Qualified Immunity

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### (C). Official Capacity Liability

Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). A Plaintiff "seeking to impose liability on a municipality under § 1983 [must] identify [an unconstitutional] policy or custom that caused the plaintiff's injury." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997). "There are two basic circumstances under which municipal liability will attach: (1) where a particular policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Moyle v. Anderson*, 571 F.3d 814, 817-18 (8th Cir. 2009) (citation omitted).

There is no genuine issue of material fact as to whether an unconstitutional custom or policy existed. The mere fact that mats are removed from the cells of inmates in segregation does not amount to an unconstitutional policy or custom. It is clear that medical staff understood

-13-

they could order twenty-four mats if a medical need existed because it was done for short periods of time for the Plaintiff.

## IV.  CONCLUSION

For the reasons stated, I recommend that the Defendants' Motion for Summary Judgment (ECF No. 34) be **GRANTED** and this case **DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 25th day of October 2017.

/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)